IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 19, 2020

## KENNETH DARRIN FISHER v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Anderson County**
**No. B1C00719      Donald Ray Elledge, Judge**

_____

## No. E2019-01816-CCA-R3-PC

_____

The petitioner, Kenneth Darrin Fisher, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel at trial and on appeal. Specifically, the petitioner asserts trial counsel was ineffective for failing to properly prepare the petitioner to testify at trial; failing to object to the State's assertion that the gun found in the petitioner's vehicle was an "assault rifle;" failing to object to the admission of the unredacted video of the petitioner's police interview; and failing to appeal the trial court's admission of Ms. Burchett's recorded preliminary hearing testimony. The petitioner also asserts he was deprived due process when the post-conviction court sustained the State's objection regarding Ms. Green's testimony. After our review of the record, briefs, and applicable law, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and CAMILLE R. MCMULLEN, JJ., joined.

William F. Evans, Jacksboro, Tennessee, for the appellant, Kenneth Darrin Fisher.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; David S. Clark, District Attorney General; and Emily Abbott, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

On direct appeal, this Court summarized the facts surrounding the petitioner's conviction for attempted first degree murder, as follows:[1]

At the trial, Clinton Police Department 9-1-1 Center employee Amanda Carter testified that on the evening of August 26, 2011, she received calls from individuals who identified themselves as the [petitioner's] father and a friend of the [petitioner]. She identified a compact disc containing recordings of the calls, and the calls were played for the jury. In one call, the [petitioner's] father stated that the [petitioner] had left the father's house with an M14 rifle and ammunition and was "headed up towards LaFollette" because the [petitioner] was "after" the [petitioner's] wife, whom the father stated was living with another man and had asked for a divorce. In another call, the [petitioner's] friend, Jody Patterson, stated that the [petitioner] was "on his way back to Clinton right now" to a specified address. Mr. Patterson stated that the [petitioner] was coming to the address "to say 'bye'" to some friends. Mr. Patterson said the [petitioner] had stated he was in the "Knoxville Oak Ridge area" and would call again when he was "on his way." Mr. Patterson stated the [petitioner] was armed with an M14 and "plenty of ammo." Mr. Patterson specified that responding officers should park in the back of a business at the address in order to prevent the [petitioner] from seeing them. Mr. Patterson stated that the [petitioner] was "AWOL" and that he had called the police because the [petitioner's] friends wanted the [petitioner] to get the help the [petitioner] needed.

. . .

Oliver Springs Police Officer Bruce Morgan, who was employed with the Clinton Police Department on August 26, 2011, testified that he heard radio calls about an armed male subject traveling in a described vehicle. He said that he and Officer Jackson were in the area where the vehicle was described as possibly being and that they parked nearby and watched the apartment to which the subject was supposed to be traveling. Officer Morgan said that within a few moments, they saw the vehicle that had been the subject of the radio calls and that they approached the [petitioner], who was dressed in military fatigues and boots. He said he and Officer Jackson had their police-issued shotguns trained on the [petitioner] because the radio dispatch had included information that the [petitioner] might be armed with a rifle. Officer Morgan said that they ordered the [petitioner] onto the ground and

---

[1] Due to the length of the trial court testimony, we have only included those facts relevant to the issues raised on post-conviction and before us.

- 2 -

that Sergeant Gregory handcuffed the [petitioner], who did not struggle or resist. Officer Morgan said they removed "knives and stuff" from the [petitioner's] waistband and pockets. He said the [petitioner] had two knives, each of which was sheathed and in a different pocket. One was a hunting or military-style knife, and the other was a "multi-tool" knife.

. . .

Clinton Police Sergeant Scott Gregory testified that he came into contact with the [petitioner] shortly before midnight on August 26, 2011. He said he and other officers had been searching for a specific vehicle containing a person armed with a rifle based upon information they received from dispatch. He said that when he arrived at the address of an apartment in Clinton, other officers held shotguns toward the [petitioner], who was "prone" on the ground. Sergeant Gregory handcuffed the [petitioner] and searched him for weapons, locating a large, green sheathed knife, a smaller multi-purpose tool in a case, and two other knives in the [petitioner's] cargo pants pockets. Sergeant Gregory said the [petitioner] was cooperative and followed Sergeant Gregory's commands. Sergeant Gregory said the [petitioner] stated that he was AWOL from Fort Drum and that he had been deployed to Afghanistan. Sergeant Gregory saw a rifle on the front passenger seat of the [petitioner's] car. Sergeant Gregory took a statement from Leslie Hannah [Burchett], a resident of the apartment. Sergeant Gregory identified photographs of the [petitioner], the knives, and the rifle inside the car, which were taken at the scene. He said a magazine was "seated" in the rifle, meaning the rifle was ready to be fired. He said the magazine appeared to be capable of holding twenty rounds, but he did not know if it was loaded or if a bullet was in the rifle's chamber.

. . .

Leslie Hannah Burchett testified that she was Jody Patterson's ex-wife. She knew the [petitioner] from high school and said the [petitioner] and Mr. Patterson had been close friends. She recalled the police coming to her apartment on August 26, 2011, but she did not recall any telephone calls she received beforehand that night, Mr. Patterson's being home, or Mr. Patterson's calling the police. She recalled that the [petitioner] came to the apartment and that she had been outside smoking with the [petitioner] when the police approached. She said the police were there because the [petitioner] was "in trouble" but did not recall how the police were aware of the problem. She did not recall attending an event with the [petitioner] two weeks before

- 3 -

August 26 and did not recall testifying at the preliminary hearing. She said the [petitioner] had told "us" that the [petitioner's] wife left him. She did not recall any discussion with the [petitioner] "concerning violence to his wife."

When shown the August 26, 2011 written statement she gave law enforcement, Ms. Burchett acknowledged she had no reason to believe the document was not authentic. She said she had been truthful in the statement. She read portions of the statement to the jury. The statement provided, in part:

> When [the petitioner] got home [to] Tennessee it was obvious he was not going back to Fort Drum. It was almost like he was a totally different person. He used to be a very laid-back, fun-to-be-around kind of person. After a day or two of coming back he started talking about where his wife Kendall Dunham was staying in LaFollette with Anthony Walden to kill her and him. I thought he was just blowing steam until he brought the shells bullets to do it with. He then proceeded to tell me how he was going to kill them. [The petitioner] told me he was just going to shoot Anthony but he was going to take his time with Kendall. He said he was going to start off by carving whore into her forehead so she would be marked for what she is and so the whole world would know it as well. [The petitioner] also told me that he was going to sew her vagina shut so she could never hurt anyone again. After he did this he said . . . he hadn't decided if he was going to shoot her or stab her. [The petitioner] had also said that if the police showed up during all of this he wasn't going down without a fight and the police weren't going to take him until he was either out of bullets or dead. He told me he wasn't going to pull the trigger on himself, he would force someone else to. He had also said over and over he wished he was dead.

After reading the statement, Ms. Burchett acknowledged her signature but stated that although she recalled giving the statement, she had no recollection of the conversation with the [petitioner] it referenced. She said she had anxiety and depression and that although she had taken anxiety medication at the time she gave the statement, she did not take it at the time of the trial.

- 4 -

When shown a transcript of her preliminary hearing testimony, Ms. Burchett said that reviewing it did not refresh her memory of having gone somewhere with her ex-husband and the [petitioner] a few days to a week before August 26, 2011.

Rachel Shell, an employee of the general sessions court, testified that she had been asked to provide the recording of the [petitioner's] preliminary hearing relative to the testimony of Leslie Hannah Patterson, which other evidence showed was the name by which Ms. Burchett was formerly known. The recording was received as an exhibit and played for the jury.

The recording of the preliminary hearing reflected that Ms. Burchett testified she and her husband had talked to the police about the [petitioner] one to one and one-half weeks before August 26, 2011. She said they went to the police because the [petitioner] made statements about killing his wife a few days earlier and because they saw him buy bullets at a gun show the day before they went to the police. She said they took the bullets to the police. She said the police stated they could not arrest the [petitioner] for "talking s---." She said that after they went to the police, she had two or three conversations with the [petitioner] in which he spoke of killing his wife. She said the [petitioner] stated his wife had hurt him and antagonized him on the telephone. She said the [petitioner] stated he wanted to "kill that b----" and shoot and kill the man with whom she lived. She said the [petitioner] stated he was going to carve "whore" in his wife's forehead in order to warn others and prevent her from hurting anyone else. She said the [petitioner] did not know if he would shoot or stab his wife.

In the recording of the preliminary hearing, Ms. Burchett testified that on August 26, 2011, she learned what was occurring relative to the [petitioner] when the [petitioner's] father called her home. She said both the [petitioner's] father and Ms. Burchett's then-husband, Mr. Patterson, called the police because they did not know the [petitioner's] state of mind. She said Mr. Patterson called the [petitioner] and learned the [petitioner] was driving toward Knoxville. She said she spoke to the [petitioner], who did not state where he was going or what he was doing when she questioned him. She said he stated, "I've got to do it." She said that she invited the [petitioner] to come to her and Mr. Patterson's home and that the [petitioner] agreed. She said the [petitioner] arrived about one and one half hours later. She said she went downstairs, hugged the [petitioner], and asked where he was going. She said he responded that she knew where he was going. She said she asked him to smoke a cigarette with her. She said that as the [petitioner] went to

- 5 -

his car to get a cigarette, two police officers ran across the street with shotguns. She said the officers detained the [petitioner], searched him, recovered knives, and handcuffed him. She said that the [petitioner] told the police he was not in his right mind, that they told him "this was not the right way to go about it," and that an officer said the [petitioner] was under arrest. She said the [petitioner] was cooperative and honest with the police. She said that when an officer stated a gun was in the [petitioner's] car, the [petitioner] stated that a clip was in the gun, but no bullet was in the chamber. She said she had heard everything said between the police and the [petitioner]. She never heard the [petitioner] say he had intended to kill his wife. She did not hear the police read the [petitioner] his rights.

In the recording of the preliminary hearing, Ms. Burchett testified that the [petitioner] had also spoken of going into the mountains of Tennessee or to South America because he was heartbroken and did not think he could "deal with it anymore." She said that although she did not know the [petitioner's] wife's whereabouts on August 26, 2011, she understood the [petitioner's] wife might be in the Jacksboro/LaFollette area. She agreed that if the [petitioner] had gone to Knoxville, he would have been driving away from, rather than toward, the area where his wife was living.

. . .

Assistant Chief Becker testified that he interviewed the [petitioner] at the police department. Assistant Chief Becker said that he advised the [petitioner] of the [petitioner's] *Miranda* rights and that the [petitioner] waived his rights. Chief Becker said the [petitioner] did not appear to be under the influence. He identified a video recording of the interview, which was received as an exhibit and played for the jury. In the interview, the [petitioner] stated the following: He and his wife had been married for three months. Two weeks before the date of the statement, the [petitioner's] wife left Fort Drum after telling him she had to go home to help with her mother. The [petitioner] said he left Fort Drum "to come home to fix it." He said he learned that his wife had confessed to her best friend that she was having sex with other men during the marriage and that one of his best friends tried to have a "threesome" with her. He said a friend advised him that the [petitioner's] wife had only "played" him "for the money." The [petitioner] stated that his wife hated him and refused to talk to him and that she was in LaFollette. He said that before he was apprehended, he had intended to locate his wife and kill her "before she could do that to anyone else" and that he planned to leave the country. He said he had intended to shoot his wife in

- 6 -

the leg to prevent her from fleeing, cut a tattoo off her arm, and kill her by shooting her again. He said the tattoo had the date of his wife's miscarriage and that he had intended to tell her it was good she had miscarried because a child "didn't need a whore as a mom." He said that although he did not know his wife's address in LaFollette, he had a photograph of the car she had been driving. He said he had also planned to kill the man with whom his wife was involved. He said the M14 rifle belonged to his father. The [petitioner] stated that he stopped in Clinton because his friends Jody and Hannah wanted to see him before he left. He said he had discussed his plan with them previously. When asked about a "round" on the driver's seat, he said the gun had never been loaded and that he had begun loading a second, twenty-round magazine from a bag of 100 rounds. When asked if he had planned to kill himself, he said that he had planned for the police to come and that he planned to die in a shoot-out. He acknowledged that he was AWOL from Fort Drum and said he had considered volunteering for a deployment but decided to come home instead. He said that he had intended to talk to his parents but that they had not answered his call. The [petitioner] stated that he had last been in contact with his wife the previous week and that she knew he had come home. He said he had developed the plan to kill his wife the previous week, after he learned "the whole thing was a lie."

In the statement, the [petitioner] said that the previous evening, he had been at home and asked his father for permission to clean the guns. He said his father kept the guns and ammunition in a safe. He said he removed screws that secured windows of the house and disabled an alarm. He said he went out a window with an M14 and ammunition and ran to his car. He said his father called two minutes later, but he did not answer. The [petitioner] said Mr. Patterson called and then sent him a text message when he did not answer the call. He said Mr. Patterson had advised him that the police would be looking for him. The [petitioner] said that he later spoke to Mr. Patterson and that Mr. Patterson and Ms. Burchett wanted the [petitioner] to visit them. The [petitioner] said he had been "going off toward Lovell Road" but turned around. He said he stopped on the way to Clinton, changed into his uniform, and loaded a magazine. He said that after he arrived at Mr. Patterson and Ms. Burchett's home, Ms. Burchett asked where he was going and what he was doing. He said he responded, "You know where I am going. I have to do this for me. I have to get closure." He said she told him that he did not have to do it and asked him to smoke a cigarette with her. He said that the police approached him as he was getting a cigarette from his car. He said he cooperated with the police. He thought that he had 143 rounds of ammunition in his car and that twenty of them were for hunting. He said he

- 7 -

obtained the ammunition "just the other day." The [petitioner] stated that he knew he should return to Fort Drum but that if he did so, he would kill one of his best friends because the man had been with the [petitioner's] wife.

. . .

The [petitioner] testified that he had been in the Army, had been stationed at Fort Drum, and had been deployed to Afghanistan. He said that he did not experience combat but had been threatened by children with weapons on three occasions while he was in Afghanistan. He said that although the military rules of engagement dictated that he should have killed these individuals, he did not because they were children. He said he returned to Fort Drum from Afghanistan approximately five months before August 2011. He said that he had known his wife since high school and that they were married after he returned from Afghanistan. He said they had not dated previously, that he had been indoctrinated during the deployment to believe the military was "the best," and that he wanted to start a family with his wife. He said that he believed at the time that she was in love with him and that he loved her. He said that after he and his wife were married, his father advised him of a rumor about his wife's having been unfaithful and that his wife's best friend said his wife had been unfaithful. He said he became angry and developed the homicidal thoughts about which Assistant Chief Becker testified. The [petitioner] said he knew his wife was in the LaFollette area. When asked if he would have carried out his plan if he had encountered his wife on August 26, 2011, he said he had not been able to kill the children in Afghanistan and asked, "How could I kill an innocent civilian and whoever she was with."

The [petitioner] testified that when he left his father's house on August 26, 2011, he went toward Lovell Road in Knoxville. He said he did not know his destination. He said that when Mr. Patterson advised him the police were looking for him, he thought it was because he was AWOL. He thought Mr. Patterson had told him about the police looking for the [petitioner] before the [petitioner] asked his father to clean the guns and before the [petitioner] left Anderson County. The [petitioner] said he thought he needed to get out of town and get a fresh start. The [petitioner] said that when Mr. Patterson called and wanted him to come to Mr. Patterson's house to say goodbye, the [petitioner] wanted to see his friends one more time before he "took out and went [somewhere he] didn't know anybody." He recalled that after he turned around and drove toward Clinton, he stopped but did not recall why.

The [petitioner] testified that he was at Mr. Patterson and Ms. Burchett's house for ten to fifteen minutes before the police approached him. He said he knew the people who approached him were police because he had heard the sounds of their rifles. He acknowledged he had thought about committing "suicide by cop" but did not think he would have acted on the thought.

The [petitioner] testified that he had given the recorded statement voluntarily. He said he never thought he could have committed the crimes he described to Assistant Chief Becker. He said that his thoughts had been disturbing and that he had been "young and stupid" and "in a messed up place." He said he thought the best thing he could do was to tell the police about his thoughts because they would ensure he did not act on the thoughts. He said he did not regret telling Assistant Chief Becker about his thoughts because he knew "it stopped something from happening." The [petitioner] said he felt better after telling Assistant Chief Becker about the thoughts because the [petitioner] knew he could not do anything to make his thoughts happen. The [petitioner] said that after telling a law enforcement officer about thoughts of this nature, "They can put you in handcuffs and make sure you don't do anything that you'd regret." The [petitioner] said he had a "slim thought" of carrying out his thoughts about harming his wife but denied his harmful thoughts had been intentions. He said they were merely a "disturbing fantasy." He agreed, however, that the only reason he did not kill his wife was because the police stopped him.

When asked if he recalled telling Ms. Burchett that he intended to sew his wife's vagina closed, the [petitioner] testified that he did not remember exactly what he told Ms. Burchett. He said he "might have" said it. He said he knew he said "some disturbing things like the whore and the tattoo." He agreed he had gone to a gun expo with Mr. Patterson and Ms. Burchett and that he bought bullets at the expo. He said, however, that he had not remembered until the trial that he had gone to the expo and claimed he did not recall whether he bought bullets at the expo in order to kill his wife. He thought his buying the bullets was an "act of need" to show that he was having disturbing thoughts about which he was conflicted.

The [petitioner] acknowledged that he had not wanted his father to know he took the rifle out of the house and that he snuck out of the house with the rifle, his military fatigues, and over 100 rounds of ammunition. He also acknowledged he did not answer when his father called him. He

- 9 -

acknowledged telling Mr. Patterson, "I've got to do this, I've got to get closure." He acknowledged saying in his police interview that he had gone to Mr. Patterson's house to say goodbye to his parents and to apologize for leaving without saying goodbye to them. The [petitioner] acknowledged saying he had come up with the plan to kill his wife when he found out "the whole thing was a lie." He also acknowledged that he had not told the police the plan to kill her had been a fantasy. He did not think the police asked if he would go through with the plan.

*State v. Kenneth Darrin Fisher*, No. E2016-01333-CCA-R3-CD, 2017 WL 4083785, at *1-6 (Tenn. Crim. App. Sept. 15, 2017), *perm. app. denied* (Tenn. Feb. 14, 2018).

Following the denial of his direct appeal, the petitioner filed a timely pro se petition for post-conviction relief. After the appointment of counsel, the petitioner filed an amended petition for post-conviction relief, arguing, in part, trial counsel was ineffective for failing to properly advise the petitioner whether to testify at trial; failing to object to the State's reference to an "assault rifle" in closing arguments; failing to object to the admission of the unredacted video of the petitioner's police interview; and failing to raise on direct appeal the admission of Leslie Burchett's preliminary hearing testimony.

At the post-conviction hearing, trial counsel testified he was retained to represent the petitioner prior to the preliminary hearing and continued his representation through the petitioner's direct appeal. Because trial counsel recommended the petitioner not testify at trial, he did not conduct mock direct or cross-examinations. However, prior to the petitioner's *Momon*[2] hearing, the petitioner informed trial counsel of his desire to testify, which trial counsel believed was, in part, to please the petitioner's father. Trial counsel quickly discussed a few important points for the petitioner's direct and cross-examinations but did not have a detailed outline or checklist prepared. On cross-examination, trial counsel testified he and the petitioner discussed the possibility of the petitioner testifying approximately eight or nine times. During each conversation, trial counsel told the petitioner "there was no way [they] would have him testify." Trial counsel also agreed the petitioner testified he simply had a murderous fantasy and did not intend to go through with the murder.

Because trial counsel reviewed the petitioner's recorded police interview prior to trial, he was aware the petitioner stated he would have killed his wife's new boyfriend if he was with the petitioner's wife. During the interview, the petitioner also stated he wanted to kill his friend at Fort Drum because he tried to have sex with the petitioner's wife. However, trial counsel did not ask for those statements to be redacted from the video

---

[2] *Momon v. State*, 18 S.W.3d 152 (Tenn. 2000).

- 10 -

because he "didn't think of it." He agreed his decision was not a trial tactic, and he should have asked for the video to be redacted. On cross-examination, trial counsel conceded the petitioner had also viewed the video of the interview prior to trial.

During closing arguments, the prosecutor referred to the gun found in the petitioner's vehicle as an assault rifle. Trial counsel knew the gun was not an assault rifle and agreed he filed a request for a special jury instruction on the definition of "assault rifle." However, trial counsel did not object to the prosecutor's statement for "a combination of reasons." Because he was "thinking really fast and really hard" about when to speak up, trial counsel "let [the reference] go by." He was also concerned the trial court would not understand his objection, which would only "magnify the argument that [the petitioner] had an assault weapon." Nonetheless, trial counsel could not define his decision as tactical because "[i]t happened so quickly." On cross-examination, trial counsel agreed that, because the gun was admitted into evidence, the jury was able to examine it. Additionally, when the prosecutor referred to the gun as an assault rifle during the petitioner's cross-examination, the petitioner corrected the prosecutor and stated the gun was not an assault rifle.

At trial, Leslie Burchett testified she could not recall many of the events leading up to the petitioner's arrest. The State attempted to refresh Ms. Burchett's memory with the transcript of her preliminary hearing testimony, and, when Ms. Burchett testified the transcript did not refresh her memory, the State introduced a recording of her preliminary hearing testimony. Prior to the admission of the recording, the State called Rachel Schell, an employee in the clerk's office, who authenticated the recording. Trial counsel objected to the admission of the recorded testimony because the State failed to prove Ms. Burchett was sworn in prior to testifying. Although trial counsel could not initially recall why he did not include this issue in the petitioner's direct appeal, he testified he later verified Ms. Burchett was, in fact, properly sworn in at the preliminary hearing. Additionally, trial counsel did not consider the issue to be very strong and chose to focus on the strongest issues on appeal. On cross-examination, trial counsel conceded he had a copy of Ms. Burchett's preliminary hearing testimony prior to trial. However, he disagreed that Ms. Burchett was attempting to be favorable toward the defense, and, if that was her goal, her efforts were "completely useless and idiotic."

The petitioner testified that whenever he and trial counsel discussed the possibility of the petitioner's testifying at trial the petitioner told trial counsel to decide because he was "the legal expert." Although trial counsel told the petitioner they would "cross that bridge when [they came] to it," trial counsel indicated the petitioner would not testify, and, while trial counsel went over the advantages and disadvantages of testifying, he did not conduct a mock direct or cross-examination with the petitioner. At trial, during a recess, trial counsel approached the petitioner and asked how he felt about testifying. Although

- 11 -

trial counsel did not tell the petitioner to testify, the petitioner believed it was necessary because trial counsel "looked worried about something." Trial counsel told the petitioner not to get "stumbled up" during cross-examination and to listen to each question being asked of him. The petitioner did not know what topics would be discussed during his testimony but told trial counsel to ask the petitioner about Afghanistan.

The petitioner testified, if he had been better prepared by trial counsel, he could have made a "better" decision about whether to testify. Additionally, the petitioner would have been able to keep calm during cross-examination and not blurt out answers. On cross-examination, the petitioner agreed that it was his decision to testify and that he told the truth during his trial testimony. He also agreed, at trial, he testified on cross-examination that he intended to murder his wife and the only reason he did not do so was because the police stopped him.

The petitioner testified the gun found in his vehicle at the time of his arrest was an M1 Alpha semi-automatic rifle. According to the petitioner, the State's characterization of the gun as an assault rifle was problematic because the general public associates assault rifles with mass shootings. Essentially, the petitioner believed the State used the term "assault rifle" as a scare tactic. On cross-examination, the petitioner agreed an M1 Alpha is capable of murdering someone. He also agreed that he corrected the prosecutor during trial when the gun was referred to as an assault rifle during the petitioner's cross-examination.

The petitioner also called Connie Green, a juror during the petitioner's trial, as a witness at the post-conviction hearing. However, when the petitioner attempted to question Ms. Green about the jury's deliberations, the post-conviction court sustained an objection by the State and held the jury's deliberations are private.

After its review of the evidence presented, the post-conviction court denied relief, and this timely appeal followed.

### *Analysis*

On appeal, the petitioner asserts trial counsel was ineffective for failing to properly prepare the petitioner to testify at trial; failing to object to the State's assertion that the gun found in the petitioner's vehicle was an "assault rifle;" failing to object to the admission of the unredacted video of the petitioner's police interview; and failing to appeal the trial court's admission of Ms. Burchett's recorded preliminary hearing testimony. The petitioner also asserts he was deprived due process when the post-conviction court sustained the State's objection regarding Ms. Green's testimony. The State contends the post-conviction court correctly denied the petition and disallowed Ms. Green's testimony.

## I.   Trial Counsel

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence.  Tenn. Code Ann. § 40-30-110(f).  The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them.  *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996).  This Court will not reweigh or reevaluate evidence of purely factual issues.  *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997).  However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness.  *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998).  The issue of ineffective assistance of counsel presents mixed questions of fact and law.  *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).  Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact.  *Id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee).  The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.  In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied.  *Id*.  Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms."  *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter*

*v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## A. Failure to Prepare the Petitioner to Testify

The petitioner argues trial counsel was ineffective for failing to properly prepare him to testify at trial. Specifically, the petitioner contends trial counsel should have realized the petitioner would need to testify about his homicidal fantasies and, therefore, should have prepared an outline and conducted mock direct and cross-examinations. The petitioner argues he would have been able to keep calm under cross-examination if he was better prepared. The State contends the petitioner has failed to establish trial counsel was deficient in regards to the petitioner's trial testimony. The post-conviction court made the following findings regarding this issue:

> [L]ike the [petitioner] said, his attorney didn't tell him to testify. In fact, he kept saying, we shouldn't testify, you shouldn't testify. He said eight or nine times he advised him of that; you shouldn't testify. The [petitioner] said today that he testified because it looked like his attorney was hesitant and it looked like it wasn't going well. Well, of course it wasn't going well. Preparation . . . and let me reflect on the [petitioner's] testimony that that would have given him more time, more time for what? If you are telling the truth, and I always told my clients this. Listen to the question, make sure you understand it. Once you understand it, answer it. And answer it truthfully. You don't have to think. You can blurt out anything as long as it is the truth. So the only thing I can conclude from your testimony today that would have given you more time to think about what you could do that wouldn't be truthful on the stand, which is a felony in and of itself.

At the post-conviction hearing, trial counsel testified he and the petitioner discussed the petitioner's potential testimony eight or nine times. However, because trial counsel recommended the petitioner not testify at trial, he did not prepare an outline or conduct mock direct and cross-examinations. During trial, when the petitioner informed trial counsel that he wished to testify, trial counsel discussed a few important points for the petitioner's direct and cross-examinations. The petitioner testified he left the decision of

- 14 -

whether he should testify up to trial counsel because he was "the legal expert." At trial, during a recess, trial counsel approached the petitioner and asked how he felt about testifying. Because trial counsel looked worried, the petitioner believed he needed to testify. Trial counsel told the petitioner not to get "stumbled up" on cross-examination and to listen to the question that was being asked. The petitioner was not aware what topics would come up during his testimony but told trial counsel to ask him about Afghanistan. If he had been better prepared, the petitioner testified he would have kept calm while testifying on cross-examination. The petitioner also agreed that it was his decision to testify and that he told the truth during his testimony. He also agreed that he testified on cross-examination that he intended to kill his wife and the police stopped him from doing so.

Implicit in the post-conviction court's order denying relief is an accreditation of trial counsel's testimony, and nothing in the record preponderates against the post-conviction court's factual findings. *See Tidwell*, 922 S.W.2d at 500. Trial counsel recommended the petitioner not testify. However, once the petitioner made the decision to testify, during the middle of trial, trial counsel did all he could to prepare and advise the petitioner. Thus, the petitioner has not shown deficient performance on the part of trial counsel. Furthermore, as the post-conviction court noted, the petitioner testified it was his decision to testify, and the petitioner agreed he told the truth during his testimony. The petitioner is not entitled to relief on this issue.

## B. Failure to Object to "Assault Rifle" Reference

The petitioner argues trial counsel was ineffective for failing to object to the State's reference to the gun found in the petitioner's vehicle as an "assault rifle" and "assault weapon." The petitioner contends trial counsel knew the weapon was not an assault rifle, and trial counsel's failure to object prejudiced the petitioner because the phrase "assault rifle" painted the petitioner as "a rogue member of the military, trained and hellbent on killing his wife, her paramour, and his own friend, with a rifle capable of killing numerous people with a simple pull of a trigger." The State contends the petitioner failed to prove any ineffectiveness on the part of trial counsel.

As to this issue, the post-conviction court made the following findings:

[T]he [c]ourt, as the [c]ourt always does, in the jury instructions that were filed as an exhibit for identification purposes specifically set out, as I always do, that arguments of counsel is (sic) not proof. If counsel says something that is not supported by the proof, the jury is to disregard it, or words to that effect. I've said it so many times it is engrained in my mind.

- 15 -

This is a semi[-]automatic rifle that was used, as was acknowledged by the [petitioner] himself, by the United States Army and the Marines for years. I have trained on that rifle. That was fifty years ago when I was in the Army. I trained on that rifle. It's a semi[-]automatic. It will shoot, well, there is modified rounds but it goes up to twenty . . . I'll take the twenty he said, I always thought I had more than that in my weapon. But anyway, twenty rounds he had in one of the pictures, the second picture introduced, showed pictures of two magazines. That was exhibit number nine of collective exhibit number two or three, I don't remember exactly. And then all the ammunition. And if I remember, there was well over a hundred rounds in this thing. A hundred rounds of, I would call it an assault rifle, too, but he says it's a M1 because it's a semi-automatic, it's not technically an assault rifle because an assault rifle should be automatic. So whatever, the jury had the opportunity to review and look at this and draw their own conclusion. And they were told whatever the district attorney said that they don't find true, they need to discard it.

At the post-conviction hearing, trial counsel testified he knew the gun found in the petitioner's vehicle was not an assault rifle and agreed he filed a request for a special jury instruction on the definition of "assault rifle." When the prosecutor referred to the gun as an assault rifle during closing argument, trial counsel did not object for several reasons. Trial counsel "let [the reference] go by" because he was "thinking really fast and really hard" about when to object. He also had concerns about the trial court's understanding his objection and believed this would only "magnify the argument that [the petitioner] had an assault weapon." On cross-examination, trial counsel agreed the gun was entered into evidence, and the jury was able to examine it. Trial counsel also agreed the petitioner corrected the prosecutor when the prosecutor called the gun an assault rifle while cross-examining the petitioner. The petitioner testified the gun found in his vehicle was an M1 Alpha semi-automatic rifle. The petitioner was worried about the State's characterization of the gun as an assault rifle because assault rifles are often connected to mass shootings, and the petitioner believed the State used the term "assault rifle" as a scare tactic. On cross-examination, the petitioner acknowledged an M1 Alpha is capable of murdering someone and agreed he corrected the prosecutor when he referred to the gun as an assault rifle during his cross-examination.

The post-conviction court accredited the testimony of trial counsel, and nothing in the record preponderates against the findings of the post-conviction court. *See Tidwell*, 922 S.W.2d at 500. Despite trial counsel's assertion that he would not characterize his decision as tactical because it happened so quickly, his testimony that he chose not to object because he believed it would magnify the State's argument that the petitioner was armed with an assault rifle indicates he did, in fact, make a strategic and informed decision not to

- 16 -

object to the prosecutor's statement. The fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.* Furthermore, the trial court instructed the jury to follow the law, not the opinions of the attorneys, and we presume the jury followed those instructions. *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004). The petitioner is not entitled to relief on this issue.

## C. Failure to Object to Unredacted Police Interview

The petitioner argues trial counsel was ineffective for failing to object to the admission of the unredacted video of the petitioner's police interview. The petitioner contends the video contained statements by the petitioner that he would have killed his wife's boyfriend and a friend from Fort Drum. The State contends the petitioner failed to prove any ineffectiveness regarding the interview. The post-conviction court made the following findings regarding this issue:

> [T]he video interview was admissible to prove the probative value and probative to the [petitioner's] guilt. I don't remember if it did or didn't say but let's assume that it did say he is going to kill his wife's boyfriend if he ever saw him too. Well, he wasn't charged and that's the complaint, well, he wasn't charged. It doesn't matter. Again, the jury was able to hear all the proof in this case; who was the intended target and, in fact, if I remember correctly, and I don't remember all of it, but I think it was said, if he's there with her. I think that's it but apparently he wasn't so it doesn't matter. But even if it did, the [c]ourt would not find by clear and convincing evidence that that would rise to the level of deficient performance by defense counsel in this case sufficient to prejudice the defense in violation of the defendant's constitutional rights, both state and federal.

At the post-conviction hearing, trial counsel testified he and the petitioner reviewed the video prior to trial. Trial counsel was aware the petitioner stated he would have killed his wife's boyfriend and his friend at Fort Drum. Trial counsel testified he did not ask for those statements to be redacted from the video because he "didn't think of it." He agreed he should have asked for the video to be redacted and his decision was not strategic. On cross-examination, trial counsel agreed the defense's trial strategy was to argue the petitioner was having a homicidal fantasy and did not intend to kill anyone.

To prove prejudice on a claim that trial counsel was ineffective for failing to file a motion to suppress, a petitioner must show "(1) a motion to suppress would have been granted and (2) there was a reasonable probability that the proceedings would have

- 17 -

concluded differently if counsel had performed as suggested." *Terrance Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436 at *8 (Tenn. Crim. App. Sept. 12, 2011), *no perm. app. filed* (citing *Vaughn v. State*, 202 S.W.3d 103, 120 (Tenn. 2006)). Therefore, "[i]f a petitioner alleges that trial counsel rendered ineffective assistance of counsel by failing to . . . file a motion to suppress . . . the petitioner is generally obliged to present . . . the [evidence supporting the claim] at the post-conviction hearing in order to satisfy the *Strickland* prejudice prong." *Demarcus Sanders v. State*, No. W2012-01685-CCA-R3-PC, 2013 WL 6021415 at *4 (Tenn. Crim. App. Nov. 8, 2013), *perm. app. denied* (Tenn. Mar. 17, 2014).

While in hindsight, trial counsel's decision not to object to the unredacted police interview may have been ill-advised, a defendant is not entitled to perfect representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). Additionally, "counsel must make quick and difficult decisions respecting strategy and tactics that appear proper at the time but which, later, may appear to others, or even to the trial lawyer himself, to have been ill considered." *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982).

Even if we were to conclude that trial counsel's representation in this regard fell below the constitutional standard, the petitioner has failed to demonstrate he was prejudiced by the alleged ineffective representation. The petitioner provided no proof to support his assertion that a motion to suppress portions of his police interview would have been granted. Nor has he shown that trial counsel's decision regarding the admission of the police interview effected the outcome of the proceedings, especially in light of the overwhelming evidence presented at the petitioner's trial. Accordingly, we conclude trial counsel's representation did not fall below an objective standard of reasonableness, and the petitioner is not entitled to relief on this issue.

## D. Failure to Raise Issue of Ms. Burchett's Testimony

The petitioner argues trial counsel was ineffective for failing to raise on direct appeal the admission of Ms. Burchett's recorded preliminary hearing testimony without proof that she was properly sworn as a witness at the preliminary hearing. The State contends the post-conviction court accredited trial counsel's testimony that Ms. Burchett was sworn in.

At the post-conviction hearing, trial counsel testified he objected to the admission of Ms. Burchett's preliminary hearing testimony because the State failed to prove she was sworn in prior to her testimony. However, he later verified that she was, in fact, properly sworn in at the preliminary hearing. Trial counsel testified he did not raise the issue on appeal both because he discovered Ms. Burchett was properly sworn in and because he did

not consider the issue to be particularly strong and wanted to focus on the strongest issues on appeal.

The test used to determine whether appellate counsel was constitutionally effective is the same test applied to claims of ineffective assistance of counsel at the trial level. *Carpenter*, 126 S.W.3d at 886. To establish a claim of ineffective assistance of counsel, the petitioner must show that: 1) counsel's performance was deficient; and 2) counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland*, 466 U.S. at 687; *see Carpenter*, 126 S.W.3d at 886.

When a petitioner bases his claim of ineffective assistance of counsel on counsel's failure to raise an issue on appeal, the petitioner proves deficient performance by showing that "this omission was so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Carpenter*, 126 S.W.3d at 887. The petitioner satisfies the prejudice prong of the *Strickland* test by showing there is a reasonable probability, or "a probability sufficient to undermine the confidence in the outcome," that but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

"Appellate counsel is not constitutionally required to raise every conceivable issue on appeal." *Carpenter*, 126 S.W.3d at 887; *citing King v. State*, 989 S.W.2d 319, 334 (Tenn. 1999). Generally, appellate counsel has the discretion to determine which issues to raise on appeal and which issues to leave out. *Carpenter*, 126 S.W.3d at 887. Thus, courts should give considerable deference to appellate counsel's professional judgment with regard to which issues will best serve the petitioner on appeal. *Id.* Appellate counsel is only afforded this deference, however, "if such choices are within the range of competence required of attorneys in criminal cases." *Id.*

When a claim of ineffective assistance of counsel is based on the failure of appellate counsel to raise a specific issue on appeal, the reviewing court must determine the merits of the issue. *Id.* "If an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id.* Similarly, if the omitted issue has no merit then the petitioner suffers no prejudice from counsel's decision not to raise it. *Id.* If the issue omitted is without merit, the petitioner cannot succeed in his ineffective assistance claim. *Id.*

Trial counsel testified he made a strategic decision not to raise the issue of Ms. Burchett's preliminary hearing testimony after verifying that Ms. Burchett was properly sworn in and determining the issue was not as strong as the petitioner's other issues. The post-conviction court accredited the testimony of trial counsel, and nothing in the record preponderates against the findings of the post-conviction court. *See Tidwell*, 922 S.W.2d

at 500. Moreover, the petitioner has not shown the issue had any merit. He failed to present any proof that Ms. Burchett was not properly sworn in and, therefore, has not shown he suffered any prejudice from trial counsel's failure to include the issue on appeal. The petitioner is not entitled to relief on this issue.

## II.     Post-Conviction Court Error

Finally, the petitioner argues the post-conviction court deprived him of due process by sustaining the State's objection to the testimony of Ms. Green, a juror at his trial. Specifically, the petitioner contends he faces "a nearly insurmountable obstacle" in proving prejudice without Ms. Green's testimony and argues for a reversal of current law to allow inquiry into the effects of certain evidence on jury deliberations. The State contends the post-conviction court properly excluded Ms. Green's testimony.

Tennessee Rule of Evidence 606(b)[3] states:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

The petitioner acknowledges Rule 606(b) prohibits testimony regarding jury deliberations but argues such testimony is necessary to prove prejudice in the context of post-conviction proceedings. The petitioner further argues he is being denied justice due to a public policy which protects jurors from being "inconvenienced." However, despite the petitioner's assertion, Rule 606(b) is not necessary merely to prevent jurors from being inconvenienced. Instead, "Congress' enactment of Rule 606(b) was premised on the concerns that the use of deliberations evidence to challenge verdicts would represent a threat to both jurors and finality in those circumstances not covered by the Rule's express

---

[3] Tennessee Rule of Evidence 606(b) and Federal Rule of Evidence 606(b) differ in one respect. The Tennessee rule contains an additional exception allowing for juror testimony where "the jurors agreed in advance to be bound by a gambling or quotient verdict."

exceptions." *Warger v. Shauers*, 574 U.S. 40, 50 (2014). The United States Supreme Court noted "that attempts to impeach a verdict would 'disrupt the finality of the process' and undermine both 'jurors' willingness to return an unpopular verdict' and 'the community's trust in a system that relies on the decisions of laypeople.'" *Pena-Rodriguez v. Colorado*, 137 S.Ct. 855, 866 (2017) (quoting *Tanner v. United States*, 483 U.S. 107, 120-21 (1987)). Indeed, allowing the introduction of juror testimony as proposed by the petitioner would subject jurors to "harassment by the losing party who might seek to impeach the verdict." *Walsh v. State*, 166 S.W.3d 641, 646 (Tenn. 2005).

Here, the petitioner called Ms. Green to testify regarding the effect the petitioner's trial testimony had on her deliberation. Because this testimony did not fall within one of the exceptions of Rule 606(b), the post-conviction court properly sustained the State's objection. The petitioner is not entitled to relief on this issue.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE